## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**DWAYNE FOSTER**,

    *Plaintiff,*

    v.

**GRAND VACATIONS RESORT SERVICES, INC. f/k/a DIAMOND RESORTS FINANCIAL SERVICES, INC. and EXPERIAN INFORMATION SOLUTIONS, INC.**

    *Defendants.*

Case No:    6:24-CV-00162-GAP-RMN

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW** the Plaintiff, Dwayne Foster ("**Mr. Foster**"), by and through his attorneys, Seraph Legal, P.A., and complains of the Defendants, Grand Vacations Resort Services, Inc. f/k/a Diamond Resorts Financial Services, Inc. ("**DRFS**") and Experian Information Solutions, Inc. ("**Experian**") (collectively, the "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.     This is an action brought by Mr. Foster against the Defendants for violations of the *Fair Credit Reporting Act*, 15 U.S.C. § 1681, *et seq.* ("**FCRA**").

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction for Plaintiff's FCRA claims arises under 28 U.S.C. § 1331, as the FCRA is a federal statute and the relevant transactions were committed within Orange County, Florida.

3.      The Defendants are subject to the jurisdiction of this Court pursuant to § 48.193, Fla. Stat., and Fed. R. Civ. P. 4(k).

4.      Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2), because DRFS, and Experian regularly conduct business in this District, and the parent company of DRFS maintains its principal office in this district.

## PARTIES

5.      **Mr. Foster** is a natural person who at all times relevant has resided in Glen Allen, Virgina.

6.      Mr. Foster is a *Consumer* as defined by 15 U.S.C. § 1681a(c).

7.      **DRFS** is a Nevada corporation with a principal office located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.

8.      DRFS's registered agent is **Corporation Service Company, 112 North Curry Street, Carson City, NV 89703.**

9.      DRFS is owned and operated by Hilton Grand Vacations Club, LLC ("HGVC"), a Delaware corporation with a principal address at 6355 Metrowest Blvd., Suite 180, Orlando, Florida 32835.

10.     **HGVC's** Florida registered agent is **Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.**

11.     DRFS filed an official name change from Diamond Resorts Financial Services, Inc. to Grand Vacations Resort Services, Inc. with the Secretary of State of the state of Nevada on March 18, 2024.

12.     On the tradeline in dispute, DRFS lists its address as 8415 Southpark Circle, Suite 150, Orlando, Florida 32819, which is actually the Diamond Resorts International Club, not DRFS.

13.     DRFS is a furnisher of information to multiple *Credit Reporting Agencies* ("**CRAs**"), including Experian, as that phrase is used within 15 U.S.C. § 1681, in that it regularly reports account payment and status data on consumer time-share loan agreements.

14.     **Experian** is an Ohio corporation with a principal business address of 475 Anton Boulevard, Costa Mesa, CA 92626.

15.     Experian is registered to conduct business in the State of Florida, where its registered agent is **CT Corporation System, 1200 South Pine Island Road, Plantation, FL 32301.**

16.     Experian is a CRA within the meaning of the FCRA, 15 U.S.C. § 1681a(f), in that it, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of

furnishing consumer reports to third parties, and use various means of interstate commerce for the purpose of preparing or furnishing consumer reports, specifically including internet, mail and telephone communications.

## FACTUAL ALLEGATIONS

17.    On June 13, 2015, Mr. Foster and his wife purchased a vacation time-share interest at Ocean Beach Club (the "Agreement"). **SEE PLAINTIFF'S EXHIBIT A.**

18.    Mr. Foster financed $16,297 through DRFS to cover the purchase of the time-share unit, financed at a 15.9% interest rate.

19.    On the page 1 of the Agreement, there is a "Note" that indicates "Capitalized terms used herein have those meanings ascribed to in the Time-Share Instrument or the Virginia Real Estate Time-Share Act."

20.    The Virginia Real Estate Time-Share Act (the "VRETSA") states that a "Time Share" means either a time-share estate or a time-share use plus its incidental benefits. Va. Code. Ann. § 55.1-2200.

21.    Further, the VRETSA states a "time-share estate" means a right to occupy a time-share unit or any of several time-share units during five or more separated time periods over a period of at least five years, including renewal options, coupled with a freehold estate or an estate for years in one or more time-share units or a specified portion of such time-share units. *Id.*

22.    Disclosures provided to Mr. Foster note the contract is a "deferred purchase deed of trust note," meaning that, unlike a mortgage, a trustee – an unbiased third party – holds the property's title while the loan is being repaid. **SEE PLAINTIFF'S EXHIBIT A.**

23.    Some states offer either a deed of trust or a mortgage to secure property; however, Virigina utilizes both instruments.

24.    "Deed of trust" means it is an instrument conveying the time-share estate which is given as security for the payment of the note. Va. Code. Ann. § 55.1-2200.

25.    A deed of trust provides certain benefits to the creditor, including, often, the ability to foreclose non-judicially.

26.    A deed of trust is often used as an ***alternative*** to a mortgage in a real estate transaction, providing the lender with different foreclosure options and involving a third party who safeguards the deed.

27.    A deferred purchase deed of trust is a legal instrument used in real estate transactions, and is a form of seller financing where the seller extends credit to the buyer, and the deed of trust ensures the seller's interest in the property until the deferred payments are made in full.

28.    Here, K. Lee Westnedge Jr. is the third-party trustee listed in the Agreement. ***Id.***

29.    Around December 2016, DRFS began reporting payment information about the Agreement to Experian.

30.     In its reports, DRFS reported the "account type" using the Metro 2 code "26."

31.     Metro 2 code 26 indicates the tradeline is a "Conventional Real Estate Mortgage, including Purchase Money First."

32.     The *Credit Reporting Resource Guide* notes "Purchase Money First means that the proceeds of the loan are used to **buy** the property. This is a mortgage account that is not guaranteed by a government agency."

33.     Metro 2 code "0A," indicates the tradeline is a "time share loan."

34.     DRFS could should have reported Metro 2 code 0A, and not 26 as it did to the Plaintiff's credit file.

35.     DRFS was the owner of the property as well as the seller, and thus no "purchase money" existed as the transaction simply allowed Mr. Foster to finance payments made to DRFS, the existing owner.

36.     The *Credit Reporting Resource Guide* even has a "Frequently Asked Questions" section addressing this issue, and it differentiates between reporting a "time-share mortgage" and a "time share installment loan." **SEE PLAINTIFF'S EXHIBIT B**.

37.     As outlined above, a deed of trust is not a mortgage.

38.     A deed of trust should be reported as time share installment loan under the CRRG guidelines in order to more accurately reflect the nature of the underlying transaction.

39.     Around January 19, 2023, Mr. Foster, a veteran of the United States Army, applied for a home loan with QC Lending, LLC ("QC"), to be backed by the United States Veterans' Administration ("VA").

40.     Mr. Foster's lender was unable to approve him specifically because of the DRFS tradeline appearing on Mr. Foster's Experian report indicated he had two late payments in the last 12 months concerning a mortgage relating to his primary residence.

41.     While the underwriting metrics of the VA allow for a considerable amount of flexibility with credit scores and debt-to-income ratio (often approving veterans with as low as a 600 FICO score and debt-to-income ratios as high as 55%), the VA will not guarantee a loan for a veteran whose credit report indicates late mortgage payments in the last 12 months.

42.     A veteran who was more than 30 days late paying the mortgage on his primary residence in the last 12 months is presumed to be an unacceptable credit risk for the VA, which could ultimately result in the VA having to make good on its guarantee to the lender, at the expense of taxpayers.

43.     After consultation with Mr. Foster, his lender learned that the DRFS tradeline related to a time-share installment agreement.

44.     In an email to Mr. Foster, the explained that Mr. Foster could not be approved due to a "running late mortgage," e.g. that Mr. Foster's report indicated two late payments in the last 12 months. **SEE PLAINTIFF'S EXHIBIT C.**

45.     If DRFS had reported the account correctly and accurately, as a ***timeshare loan***, Mr. Foster's lender would have been able to approve him for a VA-backed mortgage, since Mr. Foster had no other late mortgage history in the last 12 months, had FICO scores well over 600 and was under the debt-to-income ratio limits.

46.     Had DRFS properly coded the timeshare installment loan, any late payments reporting on the DRFS tradeline would not have prohibited Mr. Foster's loan officer from approving his VA-backed home loan application, and Mr. Foster could have then obtained financing to purchase a house in Florida for him and his family.

47.     Reporting a "0A" (Timeshare) code would have been the most accurate way for DRFS to report this tradeline to Experian, as it would not conflate a purchase money mortgage of a primary residence with a loan for a partial interest in a timeshare property.

48.     Indeed, other entities which have businesses similar to DRFS, such as Wyndham Resorts, report data to Experian using the "0A" (Timeshare) code.

49.     In the alternative, if no Metro 2 codes adequately represented the nature of the transaction DRFS was reporting, it could have simply elected to not report data to Experian.

## Mr. Foster's Disputes of the Debt

50.     Around April 2023, Mr. Foster disputed the DRFS tradeline to Experian, stating he disputed the late payment history reported, and that the account was not a mortgage but rather a time-share sales agreement.

51.    Experian sent DRFS an *Automated Consumer Dispute Verification* Request ("**ACDV**") through a system known as e-OSCAR, requesting that Diamond make a reasonable investigation into the dispute.

52.    DRFS responded to the ACDV a short time later and stated its reporting was accurate and required no update, change, or modification. **SEE PLAINTIFF'S EXHIBIT D.**

53.    DRFS did not report the account was "disputed by consumer" or report any other Metro 2 Compliance Condition Code ("CCC") which would disclose the data was contested to readers of Mr. Foster's report.

54.    In cooperation with the major CRAs, the ***Consumer Data Industry Association*** ("**CDIA**") publishes the Metro 2 reporting standards to assist furnishers with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year. *See* http://www.cdiaonline.org/about/index.cfm?unItemNumber=515.

55.    The Metro 2 Format Task Force is comprised of representatives from CRAs such as Equifax, Experian, Innovis, and TransUnion, and it is supported by the CDIA.

56.    The Metro 2 Format Task Force's mission is to provide a standardized method for the reporting of accurate, complete, and timely data, and has developed the Metro 2 standards.

57.     The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit-risk scoring.

58.     Equifax, Trans Union and Experian require all data furnishers, such as DRFS, to report data according to Metro 2 standards.

59.     DRFS did not adhere to Metro 2 standards when it failed to report any CCC of any kind despite DRFS being aware the data in the tradeline was disputed.

60.     The failure to report the account as disputed was problematic for the Plaintiff because: (1) nothing in the report disclosed the "mortgage" concerned a time-share, e.g. something which was not Mr. Foster's primary residence, (2) nothing in the report would indicate that Mr. Foster vehemently disputed this designation, (3) Mr. Foster disputed the late payment reporting.

61.     DRFS thus failed to conduct a reasonable investigation into Mr. Foster's dispute, as any reasonable investigation would have concluded payment for November 2022 was not more than 60 days late, as reported, and moreover, that the account itself was a time-share purchase agreement based on a deed of trust, and as such was not a mortgage, as had been reported.

62.     The failure to update reporting to indicate disputed information is disputed in and of itself violates the FCRA. *See Saunders v. Branch Banking and Trust Company of Virginia* 526 F.3d 142 (4th Cir. 2008). *Seamans v. Temple University*, 744 F.3d 853, 864 (3d Cir. 2014), (private cause of action arises under § 1681s-2(b) when, having received notice of a consumer's potentially meritorious dispute, furnisher subsequently fails to report that claim is disputed).

63.     Mr. Foster made a second dispute concerning the DRFS tradeline to Experian in May 2023.

64.     DRFS's investigation, and results, were the same as its previous one in April.

65.     Disputes in August 2023 and December 2023 likewise resulted in no change or modification to DRFS's reporting.

66.     ACDVs sent via e-OSCAR contain up to two three-digit dispute codes, along with what those dispute codes mean (e.g., "001" is "Consumer claims account not his/hers").

67.     On information and belief, the e-OSCAR ACDVs sent to DRFS in August and December 2023 contained the dispute summary as "other."

68.     An ACDV typically contains an area where the "consumer narrative" is displayed for the data furnisher to read and review and contains either the full text of the consumer's narrative, if made online, or a summary of the dispute as interpreted by the relevant CRA.

69.     The August 2023 and December 2023 ACDVs sent to DRFS by Experian stated in the "consumer narrative" that DRFS should *telephone* Experian at a particular phone number, at which point, presumably, an Experian representative would read Mr. Foster's consumer narrative to DRFS.

70.     However, on information and belief, DRFS never called Experian for this narrative to be read to it, and Experian was aware DRFS never called for the relevant information.

71.    Despite thus being in the dark as to what the dispute consisted of, and the ACDV indicating the dispute was categorized by Experian as "other," DRFS nonetheless verified it had investigated the dispute without so much as knowing what the crux of the dispute was.

72.    Additionally, even after four disputes in 12 months, DRFS still did not consider the tradeline data to be "disputed by consumer" or worthy of reporting any CCC of any kind.

**CRA's Investigations Were Not Reasonable**

73.    The FCRA also requires that each CRA conduct its own investigation of a consumer dispute. 15 U.S.C. § 1681i.

74.    Thus, upon receipt of Mr. Foster's disputes of the DRFS tradeline, Experian was legally required to investigate the dispute.

75.    However, Experian relied almost solely upon the ACDVs furnished to DRFS and the responses thereto.

76.    For at least the last 35 years, courts in this district have recognized that a CRA must make some independent reinvestigation of its own. *See Swoager v. Credit Bureau of Greater St. Petersburg*, 608 F. Supp. 972 (M.D.Fla.1985).

77.    Experian's dispute resolution systems are heavily tilted in favor of their data furnishers, from whom they receive revenue monthly, and rest on the premises the data furnishers are always right, until categorically proven wrong by the consumer.

78.     As a result, consumers like Mr. Foster, are left in a scenario where their only way to have their credit report corrected rests on their ability to disprove a negative.

79.     Experian failed to conduct a reasonable investigation into Mr. Foster's disputes, as any reasonable investigation would have concluded that the DRFS tradeline was for a time-share and not a mortgage, or at a minimum, that the Account was still disputed.

80.     With respect to the August and December 2023 disputes, Experian's investigation of Mr. Foster's disputes was even more unreasonable since Experian knew – or should have known – that DRFS never called to obtained the consumer narrative which accompanied the disputes, but had still, somehow, verified its information as accurate without knowing what the dispute concerned.

81.     The FCRA at § 1681i(a)(2)(A) requires that a CRA like Experian provide the data furnisher notice, within five business days of receipt, "all relevant information regarding the dispute that the agency has received from the consumer."

82.     Providing a phone number to call does not meet this requirement.

83.     Indeed, it is virtually axiomatic that substituting a phone number to call for more information instead of the consumer's narrative guarantees a higher rate of inaccurate information appearing in consumer reports.

84.     Even after the fourth dispute by Mr. Foster, the DRFS tradeline on Mr. Foster's Experian report remained unchanged. **SEE PLAINTIFF'S EXHIBIT E.**

85.    The DRFS "mortgage" is the only negative or adverse mortgage account reporting in Mr. Foster's Equifax, Experian or Trans Union credit files.

86.    Mr. Foster has otherwise acceptable credit, stable finances, and a good employment history.

87.    Mr. Foster has also suffered severe emotional distress from continuing to deal with an account that he understood to be a time-share installment agreement – and was – reported falsely as a "mortgage" which resulted in him being unable to qualify for a mortgage he is otherwise well-qualified to obtain.

88.    To alleviate any more damage to his credit, Mr. Foster paid the remaining balance on the time share property an received a confirmation letter dated January 12, 2024. **SEE PLAINTIFF'S EXHIBIT F.**

89.    The early payment of a large, lump-sum amount Mr. Foster had not intended to make then effected his ability to deploy those funds more beneficially, elsewhere.

90.    Mr. Foster has hired the aforementioned law firm to represent him in this matter and has assigned his right to fees and costs to such firm.

<u>**COUNT I**</u>
<u>**WILLFUL VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681s-2(b)**</u>
<u>**DRFS Only**</u>

91.    Mr. Foster hereby incorporates paragraphs 1 – 90 as if fully stated herein.

92.    DRFS violated **15 U.S.C. § 1681s-2(b)** when it failed, on at least four separate occasions, to conduct a reasonable investigation after receiving notice of

dispute of the Account from Experian, as any reasonable investigation would have concluded the account data could not be verified as accurate, as it reported the account was a "mortgage" despite the fact the instrument signed by Mr. Foster and which DRFS was reporting making reports concerning was a timeshare installment payment agreement; at a minimum, anything approaching a reasonable investigation would have determined the Account data was disputed by Mr. Foster.

93.     In several instances, DRFS was instructed by Experian to call it for the details of Mr. Foster's dispute; DRFS never called or otherwise learned what the dispute concerned, but nonetheless responded it had completed its "investigation" of Mr. Foster's dispute without first learning what the dispute concerned.

94.     DRFS's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, when the data is meritoriously disputed.

95.     DRFS's conduct was thus willful and intentional, or, alternately, was done with a reckless disregard for its duties under the FCRA to make reasonable investigations, and its policies could reasonably be foreseen to cause harm to Mr. Foster.

96.     Accordingly, pursuant to 15 U.S.C. § 1681n, DRFS is liable to Mr. Foster for the greater of his actual damages and statutory damages of up to $1,000 for *each occurrence*, as well as punitive damages, reasonable attorney's fees, and costs.

**WHEREFORE,** Mr. Foster respectfully requests this Honorable Court to enter judgment against DRFS for:

a. The greater of statutory damages of $4,000 ($1,000 per incident) or Mr. Foster's actual damages, pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b. Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c. Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. § 1681n(a)(3); and,

d. Such other relief that this Court deems just and proper.

## COUNT II
## NEGLIGENT VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681s-2(b)
## DRFS Only – In the Alternative to Count I

97. Mr. Foster hereby incorporates paragraphs 1 – 90 as if fully stated herein.

98. DRFS violated **15 U.S.C. § 1681s-2(b)** when it failed, on at least four separate occasions, to conduct a reasonable investigation after receiving notice of dispute of the Account from Experian, as any reasonable investigation would have concluded the account data could not be verified as accurate, as it reported late payments not actually late, it reported the account was a "mortgage" despite the fact the instrument signed by Mr. Foster and which DRFS was reporting making reports concerning was a timeshare installment payment agreement; at a minimum, anything approaching a reasonable investigation would have determined the Account data was disputed by Mr. Foster.

99. In several instances, DRFS was instructed by Experian to call it for the details of Mr. Foster's dispute; DRFS never called or otherwise learned what the dispute concerned, but nonetheless responded it had completed its "investigation" of Mr. Foster's dispute without first learning what the dispute concerned.

100.    DRFS's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, when the data is meritoriously disputed.

101.    Accordingly, DRFS's conduct was the result of negligence, and pursuant to 15 U.S.C. § 1681o, DRFS is liable to Mr. Foster for his actual damages, as well as his reasonable attorney's fees, and costs.

**WHEREFORE,** Mr. Foster respectfully requests this Honorable Court to enter judgment against DRFS for:

a.    Mr. Foster's actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. § 1681o(a)(2); and,

c.    Such other relief that this Court deems just and proper.

## COUNT III
## WILLFUL VIOLATIONS OF THE FCRA - 15 U.S.C. § 1681i(a)(1)(A)
## Experian Only

102.    Mr. Foster hereby incorporates paragraphs 1 – 90 as if fully stated herein.

103.    Experian violated **15 U.S.C. § 1681i(a)(1)(A)** when it failed to conduct a reasonable investigation into the four disputes of the DRFS tradeline by Mr. Foster, since any reasonable investigation would have concluded the account data could not be verified as accurate, as it reported late payments not actually late, and it reported the account was a "mortgage" despite the fact the instrument signed by Mr. Foster and which DRFS was reporting making reports concerning was a timeshare installment

payment agreement; at a minimum, anything approaching a reasonable investigation would have determined the Account data was disputed by Mr. Foster.

104.    Experian's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it is not, in large part due to Experian's virtually-complete reliance on data furnishers ACDV responses to complete its "investigations."

105.    In several instances, Experian was aware DRFS had not called to receive the details of Mr. Foster's disputes; since the information about the disputes was not contained in the ACDV and DRFS never called for the information, Experian had significant reason to know a completed "investigation" could not be reasonably relied upon.

106.    Experian's conduct was thus willful and intentional, or, alternately, was done with a reckless disregard for its duties under the FCRA to make reasonable investigations, and its policies could reasonably be foreseen to cause harm to Mr. Foster.

107.    Accordingly, pursuant to 15 U.S.C. § 1681n, Experian is liable to Mr. Foster for the greater of his actual damages and statutory damages of up to $1,000 for *each occurrence*, as well as punitive damages, reasonable attorney's fees, and costs.

**WHEREFORE,** Mr. Foster respectfully requests this Honorable Court to enter judgment against Experian for:

a.    The greater of statutory damages of $4,000 ($1,000 per incident) or Mr. Foster's actual damages, pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b.    Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681n(a)(3) and,

d.    Such other relief that this Court deems just and proper.

## COUNT IV
## NEGLIGENT VIOLATIONS OF THE FCRA - 15 U.S.C. § 1681i(a)(1)(A)
### Experian Only – In the Alternative to Count III

108.    Mr. Foster hereby incorporates paragraphs 1 – 90 as if fully stated herein.

109.    Experian violated **15 U.S.C. § 1681i(a)(1)(A)** when it failed to conduct a reasonable investigation into the four dispute of the DRFS tradeline by Mr. Foster, since any reasonable investigation would have concluded the account data could not be verified as accurate, as it reported late payments not actually late, and it reported the account was a "mortgage" despite the fact the instrument signed by Mr. Foster and which DRFS was reporting making reports concerning was a timeshare installment payment agreement; at a minimum, anything approaching a reasonable investigation would have determined the Account data was disputed by Mr. Foster.

110.    In several instances, Experian was aware DRFS had not called to receive the details of Mr. Foster's disputes; since the information about the disputes was not contained in the ACDV and DRFS never called for the information, Experian had significant reason to know a completed "investigation" could not be reasonably relied upon.

111.    Experian's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it

is not, in large part due to Experian's virtually-complete reliance on data furnishers ACDV responses to complete its "investigations."

112.    Experian's conduct was thus willful and intentional, or, alternately, was done with a reckless disregard for its duties under the FCRA to make reasonable investigations, and its policies could reasonably be foreseen to cause harm to Mr. Foster.

113.    Accordingly, Experian's conduct was the result of negligence, and pursuant to 15 U.S.C. § 1681o, Experian is liable to Mr. Foster for his actual damages, as well as his reasonable attorney's fees, and costs.

**WHEREFORE,** Mr. Foster respectfully requests this Honorable Court to enter judgment against Experian for:

a.    Mr. Foster's actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681o(a)(2); and,

c.    Such other relief that this Court deems just and proper.

**COUNT V**
**WILLFUL VIOLATIONS OF THE FCRA - 15 U.S.C. § 1681i(a)(2)(A)**
**Experian Only**

114.    Mr. Foster hereby incorporates paragraphs 1 – 90 as if fully stated herein.

115.    Experian violated 15 U.S.C. § 1681i(a)(2)(A) when it failed to provide DRFS with all information provided in a dispute to the data furnisher, DRFS, instead substituting a single sentence telling DRFS to call Experian for the details of the dispute – a call DRFS never made.

116. Experian's conduct was a result of its regular policies and procedures, which frequently result in Experian telling data furnishers to call for details of a dispute; Experian nonetheless accepts responses to the dispute even when it is aware the data furnisher never called for details.

117. Experian's conduct was thus willful and intentional, or, alternately, was done with a reckless disregard for its duties under the FCRA to make reasonable investigations, and its policies could reasonably be foreseen to cause harm to Mr. Foster.

118. Accordingly, pursuant to 15 U.S.C. § 1681n, Experian is liable to Mr. Foster for the greater of his actual damages and statutory damages of up to $1,000 for each occurrence, as well as punitive damages, reasonable attorney's fees, and costs.

WHEREFORE, Mr. Foster respectfully requests this Honorable Court to enter judgment against Experian for:

a. The greater of statutory damages of $1,000 per incident or Mr. Foster's actual damages, pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b. Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c. Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681n(a)(3) and,

d. Such other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Mr. Foster hereby demands a trial by jury on all issues so triable.

Respectfully submitted on April 1, 2024, by:

**SERAPH LEGAL, P. A.**

*/s/ Christian E. Cok*
Christian E. Cok, Esq.
Florida Bar No.: 1032167
CCok@SeraphLegal.com
2124 W Kennedy Blvd., Suite A
Tampa, FL 33606
Tel: 813-567-1230
Fax: 855-500-0705
*Attorney for Plaintiff*

**ATTACHED EXHIBIT LIST**

A    2015 Time Share Purchase Agreement – Excerpt
B    Excerpt from 2022 Credit Reporting Resource Guide
C    Email from Lender – February 28, 2024
D    April 2023 Dispute Results – Excerpt
E    Mr. Foster's Experian Report – Diamond Tradeline – Except – December 22, 2023
F    Mr. Foster's Time Share Payoff Letter – January 12, 2024

# PLAINTIFF'S EXHIBIT A
## 2015 Time Share Purchase Agreement - Excerpt

### OCEAN BEACH CLUB,
#### A TIME-SHARE

#### PURCHASE AGREEMENT
#### (Fixed Week/Floating Unit)

THIS PURCHASE AGREEMENT (this "Agreement") is executed in duplicate originals this 13th day of June, 2015 at Ocean Beach Club, a Time-Share located at ███████ and between Ocean Beach Club, LLC, a Virginia limited liability company, hereinafter referred to as "Seller" and Dwayne Akeene Foster, Social Security Number: ██████ and Barbara Jean Foster, a married couple, Social Security Number: ██████ Telephone Number: (h) ██████ (w) ██████ Address: ██████ hereinafter referred to as "Purchaser", whether one or more.

    I.  **TIME-SHARE:** Seller agrees to sell and Purchaser agrees to purchase for the Purchase Price hereinafter stated one (1) Time-Share (the "Time-Share") located in Ocean Beach Club, a Time-Share created pursuant to the Virginia Real Estate Time-Share Act by the recordation of a Time-Share Instrument for Ocean Beach Club, a Time-Share, with Exhibits, in the Clerk's Office of the Circuit Court of the City of Virginia Beach, Virginia as Instrument Number ██████ as heretofore or hereafter amended and/or supplemented (the "Time-Share Instrument" or "Instrument"). The Time-Share is defined in the Time-Share Instrument and is sold subject to the provisions of the Documents and the Statutes.

The Time-Share has the following characteristics, namely:

    1.  Assigned Unit Week number: 8.
        **(Designated for Developer Inventory Control Purposes Only)**

    2.  Assigned Time-Share Unit number: 1021.
        **(Designated for Developer Inventory Control Purposes Only)**

    3.  Time-Share Unit Type:   Herm-2 bedroom ocean view.

    4.  **Occupancy Type: Fixed/Floating:** An occupancy characteristic of a Time-Share where the above listed Assigned Unit Week is also the Fixed Unit Week and, therefore, does not change from occupancy to occupancy while the above listed Assigned Time-Share Unit changes from occupancy to occupancy.

    5.  **Time-Share Estate or Time-Share:** A fractional ownership in fee simple of an undivided interest as a tenant in common with the other Owners in all Time-Share Units situate within the Land at Termination

Note: Capitalized terms used herein have those meanings ascribed to them in the Time-Share Instrument or the Virginia Real Estate Time-Share Act.

    II.  **MAINTENANCE FEE/ASSESSMENT:** Purchaser understands and agrees that upon execution of this Agreement and in accordance with the Instrument, Purchaser shall be responsible as the Owner of the Time-Share for the payment of either a Maintenance Fee or an Assessment and its component special assessment, if any, levied in the case of the Maintenance Fee by Seller and in the case of the Assessment and special assessment by Ocean Beach Club Owners Association (the "Association"). Both the Maintenance Fee and the Assessment and/or special assessment will be paid by Purchaser to the Association. The Maintenance Fee is currently $ 564.00 for each Time-Share which shall be remitted to the Association upon demand or invoice (the "Due Date") and annually thereafter in an amount as then determined; provided, however, if Purchaser utilizes the Time-Share prior to the Due Date, the Maintenance Fee shall be paid no less than 30 days in advance of such use. The Maintenance Fee and Assessment, together with any special assessment, is in addition to the Purchase Price or other payments set forth herein. The annual Assessment or Maintenance Fee may increase or decrease the following year. Purchaser shall be obligated to pay either the Maintenance Fee or the Assessment but not both at the same time.

    III.  **UNIT WEEK.** A Unit Week is the fixed time period during which a Time-Share Owner is entitled to occupy a Time-Share Unit. Unit Weeks are numbered consecutively from one (1) through fifty-two (52) inclusive. Unit Week Number One (1) is the seven (7) day period commencing at 5:00 p.m. on the first Day of each calendar year and terminating at 5:00 p.m. on the following Day; Unit Week Number Two (2) through Unit Week Number Fifty-One (51) are consecutive seven (7) day periods commencing at 5:00 p.m. on the Day on which the preceding Unit Week terminates and ending at 5:00 p.m. on the following Day. Unit Week Number Fifty-Two (52) consists of the seven (7) day period following the termination of Unit Week Number Fifty-One (51) plus any additional days which follow prior to the commencement of Unit Week Number One (1). While the Unit Week extends until 5:00 p.m. on the Day following the Day upon which the Unit Week commenced, each Time-Share Owner shall vacate a Time-Share Unit earlier on the Day the Unit Week terminates to satisfy the Service Period, to allow weekly maintenance to be performed on that Time-Share Unit prior to the commencement of the following Unit Week. Such requirement to vacate a Time-Share Unit may not apply to a Time-Share Owner who owns two or more consecutive Unit Weeks in the same Time-Share Unit, provided the provisions of the Rules and Regulations

Contract No.: ██████                        Page 1 of 5

# PLAINTIFF'S EXHIBIT A
## 2015 Time Share Purchase Agreement - Excerpt

in reference thereto are followed. Any waiver of the weekly maintenance service shall not result in a decrease in Time-Share Estate Occupancy Expenses or Time-Share Program Expenses for which a Time-Share Owner or Guest is responsible. Unit Weeks are identified by Unit Number and Unit Week Number. Unless the Instrument or an Amendment specifies a different Day with respect to Time-Share Units in a given Phase, the "Day" referenced above is Sunday if the Assigned Time-Share Unit is located on an odd numbered floor and Friday if the Assigned Time-Share Unit is located on an even numbered floor.

IV. PURCHASE PRICE: For the Time-Share, Purchaser shall pay to Seller the amount of **Seventeen Thousand Five Hundred Sixty-Seven And 00/100 ($17,567.00**, hereinafter the "Purchase Price". The Purchase Price is payable all in cash upon execution hereof, or Purchaser may, at his sole election, avail himself of the current financing plan offered by Seller upon application therefore and subsequent qualification of Purchaser as determined solely by Seller.

In addition to the Purchase Price, Purchaser agrees to pay Closing Costs and possibly other charges, as herein detailed. The aggregate of the Purchase Price, Closing Costs and other charges is herein referred to as the "Total Sales Price."

If (C) below is zero, this is an all-cash transaction with Purchaser paying the Total Sales Price, in full, upon execution hereof, as follows:

| | | | | |
|---|---|---|---|---|
| (A) | Add | Purchase Price ................................ | **$17,567.00** | |
| | | Closing Costs ................................... | **$545.00** | |
| | | Any other costs. .............................. | **$00.00** | |
| | | Association Organizational Costs ......... | | |
| | | Maintenance Fee ............................. | | |
| | | Other Costs ..................................... | | |
| | | Total Sales Price | **$18,112.00** | (1) |
| (B) | Less | Downpayment | **$685.00** | |
| | | Additional Cash down payment **$1,215.00** | | |
| | | | | |
| | | Payment to be received by.... | | (2) |
| | | 7/17/2015 12:00:00 AM | | |
| (C) | Balance: | **Unpaid Total Sales Price**: (1 minus 2) ........ | **$16,297.00** | |

If (C) above is an amount other than zero, this is a financed transaction with Purchaser applying for an extension of credit from Seller and agreeing to pay the Total Sales Price as follows:

i.    Purchaser shall pay the Total Sales Price and Down Payment as shown in (A) and (B) above on the dates therein specified.

ii.    The Unpaid Total Sales Price in (C) above shall be paid by Purchaser executing a Deferred Purchaser Deed of Trust Note (the "Deed of Trust Note" or the "Note") in such amount secured by a Deferred Purchaser Deed of Trust (the "Deed of Trust"), the forms of which shall be as provided by Seller.

NOTICE:

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

Purchaser acknowledges and agrees that Purchaser's rights hereunder shall not accrue and the effective date hereof shall be (i) the date that all non-financed amounts due from Purchaser are received by Seller, (ii) this Agreement has been fully executed by each Purchaser and by an authorized representative of Seller, and (iii) if this is a financed transaction, Purchaser's credit is approved. If this is an all cash transaction, only items (i) and (ii) shall apply. If Purchaser fails to pay all non-financed amounts due from Purchaser by the dates stated herein, time expressly being of the essence, or should Purchaser default in the payment of the Deed of Trust Note at any time prior to the delivery and recordation of the Deed of Conveyance, and further fails to cure said default after ten (10) days written notice, Seller may void this Agreement at its sole election and retain as its liquidated damages all payments that have been made and received. It is understood and agreed the right afforded by Article V does not apply to the effective date above described in this paragraph.

V. PURCHASER'S NONWAIVABLE RIGHT TO CANCEL: This Agreement may be cancelled by Purchaser until midnight of the seventh calendar day following the execution of this Agreement. If the seventh calendar day falls on a Sunday or legal holiday, the right to cancel this Agreement shall expire on the day immediately following that Sunday or legal holiday. Cancellation is without penalty and all payments made by Purchaser before cancellation must be refunded by Seller within forty-five days after Seller receives notice of

Contract No. _____    Page 2 of 5

# PLAINTIFF'S EXHIBIT B
## Excerpt from Credit Reporting Resource Guide

## Frequently Asked Questions and Answers

**51. Question: How should timeshare mortgages and timeshare loans be reported?**

Answer: <u>If the timeshare account is a mortgage</u>, report the account according to the Mortgage Portfolio Type guidelines.  Report the following Base Segment fields as specified:

- Portfolio Type = M (Mortgage)
- Account Type Code = 26 (Conventional Mortgage) or 08 (Real Estate, specific type unknown), as applicable
- Terms Duration = number of years of the loan
- Account Status Code = 11, 13, 65, 71, 78, 80, 82-84, 89, 94, DA or DF, as applicable
- Payment Rating = applicable code when Account Status Code = 13, 65, 89 or 94
- Special Comment = Refer to Exhibit 6, Mortgage column, for applicable comments.
- Interest Type Indicator = F (fixed) or V (variable/adjustable)

<u>If the timeshare account is a loan</u>, report the account according to the Installment Portfolio Type guidelines.  Report the following Base Segment fields as specified:

- Portfolio Type = I (Installment)
- Account Type Code = 0A (Timeshare)
- Terms Duration = number of months of the loan
- Account Status Code = 11, 13, 61-64, 71, 78, 80, 82-84, 93, 95-97, DA or DF, as applicable
- Payment Rating = applicable code when Account Status Code = 13 or 95
- Special Comment = Refer to Exhibit 6, Installment column, for applicable comments.

# PLAINTIFF'S EXHIBIT C
## Email from Lender – February 28, 2024

28/02/2024, 11:58                                        Seraph Legal, P.A. Mail - Fwd: Update?



**Fwd: Update?**

Wed, Feb 28, 2024 at 11:01 AM

---------- Forwarded message ----------
From: **Anthony Bent** ████████████████████
Date: Wed, Feb 28, 2024 at 10:55 AM
Subject: RE: Update?
To: Foster, Dwayne <████████████████████

Hello,

My name is Anthony with QC Lending. It was a pleasure speaking with you early today. We did run your credit twice last year. The first credit pull was on **1/19/2023 & 10/24/2023**.

We were unable to issue a preapproval letter during those credit pulls because the timeshare was reporting as a running late mortgage payments. This would not allow Mr. Foster to utilize your VA loan program to purchase a home.

If you have any questions, please do not hesitate to call and have a WONDERFUL DAY!

Thank you,

Anthony Bent

*Mortgage Loan Originator*

*NMLS #1747588*



*NMLS #998768*

301 S. McDowell St, Ste 205

1/9

# PLAINTIFF'S EXHIBIT D
## Experian's Dispute Results – May 24, 2023 - Excerpt

5/24/23, 11:40 AM                                    Experian - Access your credit report

DWAYNE FOSTER  |  Report number   |  May 24, 2023  |  Print  |  Close window

### How to read your results

**Deleted**
This item was removed from your credit report.

**Remains**
The company that reported the information has certified to Experian that the information is accurate. This item was not changed as a result of our processing of your dispute. Please review your report for the details.

**Processed**
This item was either updated or deleted. Please review your report for the details.

**Updated (Your results will indicate which one of the following applies.)**

- The information you disputed has been updated. Please review your report for the details.
- The item you disputed has been updated, which may include an update to the disputed information. Please review your report for the details.
- Information on this item has been updated. Please review your report for the details.

**Verified and Updated**
The information you disputed has been verified as accurate, however, information unrelated to your dispute has been updated. Please review your report for the details.

### Print your report

Below is all the information currently in your credit report. The payment history guide and common questions will help explain your credit information. Print this page or write down your report number for future access.

**Address**
Experian
P.O. Box 9701 Allen, TX 75013

**Any pending disputes will be highlighted below.**

Here are your dispute results 05/24/2023

Credit Items and Public Records

| Creditor / Vendor | Account number | Status | |
|---|---|---|---|
| | | | |
| DIAMOND RESORTS FS | | Remains | The company that reported the information has certified to Experian that the information is accurate. This item was not changed as a result of our processing of your dispute. Please review your report for the details. |

about:blank                                                                                              1/34

# PLAINTIFF'S EXHIBIT E
## Mr. Foster's Experian Report Diamond Tradeline – December 22, 2023



12/22/23, 4:01 PM                                    Experian - Access your credit report

DWAYNE FOSTER  |  ██████████████  |  December 22, 2023  |  Print  |  Close window

### Print your report

Below is all the information currently in your credit report. The payment history guide and common questions will help explain your credit information. Print this page or write down your report number for future access.

**Address**
Experian
P.O. Box 9701 Allen, TX 75013

**Any pending disputes will be highlighted below.**

| Personal Information | |
|---|---|
| Name(s) associated with your credit | |
| **Name** | **Name identification number** |
| DWAYNE A FOSTER | 1 |
| DWAYNE FOSTER | 31305 |
| DWAYNE AKEME FOSTER | 8427 |
| DWAYNEAKEME FOSTER | 10730 |
| FOSTER DWAYNE | 30547 |
| DWAYNE AKENE FISTER | 10960 |
| DEWAYNE FOSTER | 29083 |
| DWAYNE K FOSTER | 15748 |
| DWANE FOSTER | 11317 |
| DAWYNE A FOSTER | 16419 |
| DWAYNE A FOSTEER | 9684 |

Address(es) associated with your credit

| Address | Address identification number | Residence type | Geographical code |
|---|---|---|---|

about:blank                                                                                          1/34

# PLAINTIFF'S EXHIBIT E
## Mr. Foster's Experian Report Diamond Tradeline – December 22, 2023



12/22/23, 4:01 PM                                    Experian - Access your credit report

**Account name**
DIAMOND RESORTS FS

**Account number**
2411....

**Recent balance**
$5,133 as of
11/30/2023

**Date opened**
07/2015

**Status**
Open.

8415 SOUTHPARK CIR STE 150
ORLANDO, FL 32819
800 411 9922
**Address identification number**
Not available

**Type**
Mortgage
**Terms**
10 Years

**Credit limit or origi-
nal amount**
$16,297
**High balance**
Not reported
**Monthly payment**
$272

**Date of status**
07/2023
**First reported**
12/2016
**Responsibility**
Joint

**Reinvestigation information**
This item remained unchanged from
our processing of your dispute in
Dec 2023.

**Account history**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 | | | | | | | | | 2022 | | | | 2021 |
| Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan | Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan | Dec | Nov | Oct |
| OK | OK | OK | OK | OK | ND | 30 | OK | OK | OK | OK | 60 | 60 | 60 | 30 | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 2020 | | | | 2019 | |
| Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan | Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan | Dec | Nov | Oct | Sep | Aug |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 2018 | | | | 2017 | |
| Jul | Jun | May | Apr | Mar | Feb | Jan | Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan | Dec | Nov | Oct | Sep | Aug | Jul | Jun |
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 2016 | |
| May | Apr | Mar | Feb | Jan | Dec |
| OK | OK | OK | OK | OK | OK |

## PLAINTIFF'S EXHIBIT E
## Mr. Foster's Experian Report Diamond Tradeline – December 22, 2023



# PLAINTIFF'S EXHIBIT F
## Mr. Foster's Time Share Payoff Letter – January 12, 2024



Stay Vacationed.

01/12/2024

DWAYNE & BARBARA FOSTER

████████████████████

RE:      **Loan Number:** ████

Dear DWAYNE & BARBARA FOSTER .

Congratulations! Your vacation ownership has been paid in full. The release document will be sent to the county recorder of the county where your home resort is located for processing.

Please allow 90-120 days for this process to complete and for you to receive your release document. If your loan payments were made by automatic debit to your account, further debits to your accounts will cease. Keep this letter with your other important papers for your records.

We are happy to have you as an owner at Diamond Resorts, where we continuously strive to provide you with a lifetime of memorable vacations. Our goal is to ensure that your experiences in all aspects of Diamond Resorts are positive ones. Should you have any questions or comments, please call us at 1.877.374.2582.

Sincerely,

Diamond Resorts Financial Services, Inc.

10600 West Charleston Boulevard • Las Vegas, Nevada 89135 • 702.684.8000 • DiamondResorts.com